UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


UNITED STATES OF AMERICA

vs.                                     CASE NO:   3:03CR135LAC and
                                                   3:04CR11LAC

KIMBERLY DUKES FORD

_____/


THIS CAUSE CAME ON FOR SENTENCING before the Honorable Lacey A. Collier, Federal Court Judge, and was reported by Donna L. Boland, Registered Professional Reporter and Notary Public in and for the State of Florida, in Courtroom 4 North of the United States Courthouse, One North Palafox Street, Pensacola, Florida, on the 13th day of April 2004.

2

1

A P P E A R A N C E S

2

3  ATTORNEY FOR UNITED STATES:)  RANDALL J. HENSEL, ESQUIRE
                               )  UNITED STATES ATTORNEY
4                              )  21 East Garden Street, Suite 400
                               )  Pensacola, Florida  32502
5                              )
                               )
6                              )
   ATTORNEY FOR DEFENDANT:     )  CLINTON ALAN COUCH, ESQUIRE
7                              )  ATTORNEY AT LAW
                               )  3 West Garden Street, Suite 352
8                              )  Pensacola, Florida  32502

9

INDEX

10

WITNESS                                           PAGE

11

SENTENCING                                          3

12

CERTIFICATE OF REPORTER

13                                                  23

14

15

16

17

18

19

20

21

22

23

24

25

WIERZBICKI & STEPHENSON COURT REPORTING

3

1    WHEREUPON,

2              THE COURT:  United States versus Kimberly Ford.

3    Good morning, Mr. Couch.

4              MR. COUCH:  Good morning, Your Honor.

5              THE COURT:  Did you review the presentence

6    report with your client?

7              MR. COUCH:  We have, Your Honor.

8              THE COURT:  And you had filed certain

9    objections.  Any of those you're not satisfied with

10   the answer of probation and wish the Court to consider

11   here today?

12             MR. COUCH:  Yes, Your Honor.  With regard to

13   the two level enhancement for possession of a firearm

14   during the conspiracy.  As is similar in the last

15   case, Ms. Dukes was not actually found in possession

16   of a firearm, but rather co-conspirators of hers had

17   possession of a firearm.

18             The distinction in this case, however, is that

19   Ms. Dukes, during all times of her relevant conduct to

20   the conspiracy, she was in Houston, Texas, and the

21   co-conspirators were in Pensacola, Florida.  The

22   weapons were found here in Pensacola, Florida.  By my

23   understanding with the government, the co-conspirators

24   who had the weapons have already indicated that they

25   never mentioned the weapons to Ms. Ford, that they

WIERZBICKI & STEPHENSON COURT REPORTING SERVICE

1   never had them where she would see them.  They were

2   never displayed.  She had no actual knowledge of the

3   weapons at all.

4           So the question comes is, was it foreseeable

5   for her to anticipate that they would have these

6   weapons?  Her conduct in the conspiracy primarily was

7   making introductions initially and then handling

8   packages which contained either illicit drugs or

9   currency.  She did not actually participate in the

10  drug transactions themselves.  In other words, she

11  didn't buy the drugs or sell the drugs.

12          So we would suggest to the Court that her

13  conduct was not of the type that is contemplated by

14  the case law or the statute which makes it reasonably

15  foreseeable that she would anticipate that

16  co-conspirators would have weapons.  Was she involved

17  in the drug conspiracy?  Absolutely.  But her role was

18  primarily that of money laundering which she was

19  already charged with.  It was, I think, a step back

20  from the actual drug trade, if you will, and as such,

21  removes her from the implication that the cases have

22  said that the people involved in these drug cases have

23  to anticipate that drugs are inherently a violent

24  activity, and that since she was not actually selling

25  drugs or buying the drugs, that she was not engaged in

1        the activity where one might anticipate violence to

2        occur.

3             So for those reasons, we would ask that the

4        Court not find her responsible for the weapons that

5        were possessed by codefendants and that the two level

6        enhancement would not be appropriate in this case.

7             THE COURT:  Mr. Hensel.

8             MR. HENSEL:  Judge, again, on the facts, I

9        don't think we argue those with the defense counsel.

10       I think we've presented a united front in the

11       presentation of the facts to the Court.

12            The co-conspirators and the firearms that they

13       possessed were all here in the Pensacola area.  I've

14       got no evidence or testimony that I can present to

15       show that the co-conspirators who possessed those

16       weapons here in Pensacola ever made the defendant

17       aware of them.  They never took weapons to Houston

18       where the defendant resided during the course of her

19       participation in the conspiracy, but her level of

20       participation in the conspiracy I think is quite

21       different from that of Newell that you just heard

22       from.

23            As you know from the presentence report, she

24       was at a much higher level, if you will.  Not as high

25       as -- not as directly involved as Mr. Newell in

6

1    handing out the drugs, but certainly her facilitation

2    of the conspiracy in accepting money and letting her

3    house be used for storage and making introductions to

4    the source of supply puts her, in my opinion, at a

5    much higher level than Mr. Newell.

6         As I've indicated and as I've explained to

7    defense counsel, I can't put a witness one on that can

8    say that she had knowledge that these co-conspirators

9    had firearms that are involved in here, but certainly

10   her knowledge of the level of the conspiracy was high

11   compared to Mr. Newell.

12        So under the facts -- under the case law it's a

13   question of reasonable foreseeability, and I'll leave

14   that for the Court's determination.

15        THE COURT:  I do find that she is well aware of

16   the entire scope of the conspiracy, and under the

17   weight in other cases that make the same findings that

18   she meets that definition.  It's a large scale drug

19   operation.  She was a member of it and it's reasonable

20   to foresee that guns would be used with drugs of that

21   amount and monies of that amount.

22        MR. HENSEL:  Yes, sir.

23        THE COURT:  Cash monies, I might note.  So the

24   objection would be overruled.  Any others?

25        MR. COUCH:  Your Honor, we had other objections

7

1    that probation has indicated will affect the

2    sentencing.   I don't know that it affects the

3    guidelines calculation.

4         With regard to paragraph 14 of the presentence

5    report, my client has objected to the suggestion that

6    the packages she received contained as much as

7    $100,000 in any one package.   She simply says she has

8    no knowledge of that but, in dealing with the other

9    codefendants, has great doubt that they could ever put

10   $100,000 together at one time.   You know, perhaps over

11   a period of time, but doubts that that package would

12   have contained $100,000.

13        Now, I don't know that the Court making a

14   determination on this would affect the guideline

15   sentence.   The purpose for us making this argument is

16   to more accurately portray her knowledge of the

17   conspiracy and her involvement in the conspiracy.   She

18   just simply could not let that statement stand

19   unchallenged.

20        MR. HENSEL:   And, Judge, in response, what my

21   cooperating defendants have told me is what they would

22   do is gather the money together, package it up, and

23   send it to the defendant's residence in Houston, then

24   they'd travel to Houston, retrieve the package, and

25   use that for the drug money to pay for the drugs which

8

1    they obtained and would then return to Pensacola,

2    distributed them, and repeat the cycle over and over

3    again.

4         They had some question as far as, you know, how

5    much trust they placed in the defendant.  The

6    defendant's position is that when she got these

7    packages, she was under strict instruction not to open

8    them.  And so when these two fellows would then get to

9    Houston, then they would open them, take the money

10   out, and use it to buy the drugs.

11        Whether she had exact knowledge of how much

12   money was in the package, I can't dispute that.  I can

13   only tell the Court what's represented in the

14   presentence report is what these fellows reported to

15   us of the amounts that they were sending.  I'm

16   confident the defendant may not have known how much

17   was in the package because these fellows didn't trust

18   her too much and I think they wanted to see that the

19   seal was still intact when they got to Houston on

20   whatever package the money was sent in and they didn't

21   necessarily open it in her presence, but certainly she

22   knew that she was receiving money that was going to be

23   used to purchase drugs.  So her lack of intimate

24   knowledge of exactly how much, I don't think we would

25   dispute that.  But the folks that were sending the

1    money told us how much money was in those packages and

2    that's what they maintain.

3         THE COURT:  Then I understand her position in

4    that, if that was the purpose of it, but I don't

5    believe that it does affect the guidelines.

6         MR. COUCH:  Yes, sir.  As to paragraph 15,

7    there's a suggestion that Ms. Ford would relay

8    messages to a person identified as Nookie, and that

9    she had had to go and find Nookie on occasion.

10        My client has told me that she has heard the

11   name Nookie before, but has never had contact with

12   them either directly or indirectly, has no knowledge

13   of who this Nookie is, whether it's a he or she or

14   what that person is.

15        So again, I don't know that this affects the

16   guidelines, but it does affect the -- we believe it

17   affects the Court's perception of her and her

18   involvement in the conspiracy.  So for whatever weight

19   the Court would put on it, she would simply say she

20   has no knowledge of who Nookie is and has never had

21   contact with this person.

22        MR. HENSEL:  And in response to that objection,

23   Judge, I've discussed with Special Agent Gravat and

24   there were a series of sources of supply in Houston

25   that the defendant and her co-defendants had contact

1   with, and she was, in essence, one of the persons that

2   introduced them to at least a couple of the sources of

3   supply.

4   Whether she had direct contact of this one in a

5   series, which this person Nookie is the only name we

6   know him by, whether she had direct contact with that

7   person, the co-conspirators thought she had, maybe she

8   didn't, but I don't think that really affects her

9   guidelines or her actual role in the conspiracy.

10   THE COURT:  It doesn't.  But for record

11   purposes, we'll strike paragraph 15.

12   MR. COUCH:  Thank you, Your Honor.  As to

13   paragraph 17, it suggests or states that when the

14   government made a presentment to the grand jury, that

15   evidence was presented that in addition to the

16   conspiracy to distribute and possess drugs or cocaine,

17   that also the grand jury heard evidence regarding

18   money laundering.

19   This was of some concern to the defendant

20   because we were of the impression that the reason for

21   us entering a plea to an information -- or to a --

22   yeah, to an information on the money laundering charge

23   was to assist the government in having to go back and

24   make another presentment to the grand jury because the

25   grand jury had not dealt with the money laundering

1   issue.

2         There was some confusion. And I believe to the

3   satisfaction of my client, we understand now after

4   having filed this objection that money laundering was

5   discussed with the grand jury, but they were not

6   actually asked to return a charge with regard to a

7   money laundering charge, but the facts were discussed.

8         We were somewhat concerned that the grand jury

9   may have returned a no true bill or refused to indict

10  her for money laundering which would have

11  substantially changed our position with regard to

12  entering a plea to this charge had we known that that

13  had occurred. And we're not saying that it did, but

14  we were unsure as to that.

15        So for the record, we wanted to make it known

16  today that we entered a plea to the money laundering

17  charge in an information rather than an indictment

18  because we believed that the grand jury was never

19  asked to pass on that specific charge.

20        THE COURT: Any comment, Mr. Hensel?

21        MR. HENSEL: Well, Judge, what happened was it

22  was a matter of timing. We were aware of Ms. Ford's

23  involvement in the drug conspiracy and we were aware

24  of her participation in the money laundering. What

25  Agent Gravat came to me with is, "We need to get a

12

1    warrant for her because she's kind of slippery and

2    we've got to find her."  And so we went ahead and

3    sought an indictment charge on the drugs and, in

4    addition, at the same time we had outstanding

5    subpoenas before the grand jury seeking financial

6    records.

7         We were trying to develop a money laundering

8    case, and we didn't want to, if you will, tip our

9    hand.  We weren't sure who she had alliances with at

10   these different financial institutions that we were

11   seeking records on Ms. Ford to assist us in bringing

12   the money laundering charge, and yet ultimately she

13   was arrested.  And when I presented them with the fact

14   that we're conducting an investigation on money

15   laundering and I think she's guilty of that, through

16   defense counsel we negotiated that she would plead to

17   an information and waive a grand jury indictment, but

18   it was the timing.

19        So I know there was some confusion because I

20   provided them with a copy of the transcript of the

21   grand jury presentation resulting in her indictment,

22   and there was testimony there regarding money

23   laundering.  But at that point in time, I think what

24   the defendant feared was, "Well, the government tried

25   to indict me for money laundering and the grand jury

13

1  didn't even find probable cause, and now they let me

2  plead to an information and they never shared that

3  with me.  Well, they've kind of been underhanded," and

4  that is not the truth.

5  We've explained that and I think everyone is

6  satisfied now that we never sought an indictment

7  charging money laundering.  It was my intent to seek

8  one if she didn't want to plead to an information, but

9  she pled to an information which is to her benefit.

10  THE COURT:  Do you understand that, Ms. Ford?

11  DEFENDANT:  Yes.

12  THE COURT:  And with that understanding, do you

13  have any problem or concern about your plea?

14  DEFENDANT:  Well, I accept the plea.  I mean, I

15  accept being guilty of it.  I don't think I was guilty

16  to the level of what they say.

17  THE COURT:  But I'm referring just to the issue

18  that Mr. Couch raises that the grand jury was never

19  asked to actually return an indictment.

20  DEFENDANT:  Yes.

21  THE COURT:  So they made no decision one way or

22  the other.

23  DEFENDANT:  Yes.

24  THE COURT:  So you entered your plea just --

25  DEFENDANT:  Just voluntarily.

1    THE COURT: -- without regard to that.

2    Anything else, Mr. Couch?

3    MR. COUCH: No, Your Honor. Those are our only

4    objections.

5    THE COURT: Any objections by the government?

6    MR. HENSEL: No, sir, Judge.

7    THE COURT: And again, Mr. Couch, as to

8    sentence?

9    MR. COUCH: Your Honor, as we were coming over

10   to the courthouse this morning, my client has provided

11   me with a letter from her grandfather. And I know

12   this is unusual to do it in this fashion. Normally we

13   provide a copy to the government and it's presented

14   through the presentence officer. I have shown Mr.

15   Hensel this letter. And if the Court is willing, I'd

16   provide it to the Court at this time.

17   THE COURT: Please. Mr. Couch?

18   MR. COUCH: Thank you, Your Honor. Also, we

19   were recently informed -- I say "we" in the sense that

20   myself and the government were informed of Ms. Ford's

21   cooperation with law enforcement in Texas in the city

22   of Houston, I believe.

23   She has been quite cooperative giving testimony

24   or at least a sworn statement with the law enforcement

25   there and they are pursuing charges of fraud and

1   identity theft in that area.  I've been contacted by

2   the investigator who assured me that Ms. Ford has been

3   very cooperative and he has since then sent a letter

4   to the government.

5       The Court has not been provided a copy of that.

6   We only just recently received it, but I think the

7   government is willing to acknowledge that Ms. Ford is

8   cooperating and that they would hope that she would

9   continue to cooperate in anticipation that she may

10  earn a Rule 35 motion at some further date.  But we

11  would just simply tell the Court at this point that

12  she is cooperating with the law enforcement in

13  Houston, Texas.

14      In addition, after she was -- had entered a

15  plea in this case, she did -- was debriefed by the

16  government and the drug enforcement administration and

17  has cooperated with them and is cooperating with them

18  in ongoing investigations and has gone as far as to

19  wear a wire and meet with objects of -- or subjects of

20  investigation.  And we'd ask that the Court recognize

21  this as not quite yet a 5K1 material, but certainly

22  moving in that direction, an acceptance of

23  responsibility, a willingness to assist the

24  government, an expression of -- I suppose an indirect

25  expression of remorse by trying to rectify the damage

1     that she's done by cooperating in this case.

2            And in summary, Your Honor, I briefly touched

3     on that her involvement in this case earlier was not

4     as a person out dealing the drugs but rather one who

5     was facilitating the purchase of drugs.  Certainly

6     just as harmful because moving the money to purchase

7     the drugs is how the large scale drug conspiracies

8     function, and I know the Court recognizes that.  But

9     Ms. Ford has sacrificed a home and all of the

10    belongings in there that she has forfeited, she has

11    not opposed the forfeiture or tried to interfere with

12    the forfeiture and the liquidation of the home that

13    she had.

14           She has, in all respects, tried to cooperate in

15    this case to the degree that she could.  She -- the

16    Court was gracious enough to allow her to remain at

17    liberty during this case and she has come to court as

18    required and has maintained contact with myself as

19    required.  And as the Court, I'm sure, recognizes that

20    that's not always the case, that clients don't always

21    stay in close contact with their attorney, much to

22    their detriment.

23           Ms. Ford is the unusual case.  She has

24    maintained close contact with me, sometimes

25    aggravatingly so, but certainly she has taken this

1    case with the utmost gravity and done everything that

2    I think that she possibly could to ameliorate her

3    situation and make amends for her actions.

4                    THE COURT:  Ms. Ford, anything you wish to say

5    before sentence is imposed?

6                    DEFENDANT:  Yes, sir.  I want to say I'm sorry.

7                    THE COURT:  Mr. Hensel?

8                    MR. HENSEL:  Judge, I can confirm that she has

9    been cooperative.  She pled guilty to the indictment.

10   She pled guilty to the information charging her with

11   conspiracy to commit money laundering.

12                   I did receive a communication from the Harris

13   County Sheriff's Department fraud investigator in

14   Houston yesterday.  She has been debriefed by them.

15   They have an ongoing fraud investigation.  And

16   according to what the investigator told me, she has

17   provided them with some additional names and kind of

18   filled in some gaps.  He may use her potentially as a

19   witness in the future.

20                   She has provided some assistance locally in an

21   ongoing investigation.  She also has a house that she

22   purchased in part with drug money provided by a

23   co-conspirator, and we explained to her that that was

24   going to be forfeited as part of the plea in

25   cooperation agreement, and she has, as my agent has

18

1    informed me, taken steps towards the sale of that

2    house.

3         It was one of those situations where the net

4    equity in the house, if I got the marshals involved

5    and they sold it, we'd end up losing money probably on

6    the deal.  But if it was a consensual sale, if you

7    will, the government had the ability to make some

8    money off of it and gather some of the proceeds back.

9    So she has been cooperative in those efforts as well.

10        The sale has not consummated yet, but it's my

11   understanding that it's close to being consummated.

12   So she has taken steps as part of the plea in

13   cooperation agreement.  We agreed to make the Court

14   known of the assistance she has provided, so she has

15   helped.  She hasn't risen to the level of substantial

16   assistance, but it may after she's sentenced and we

17   may be approaching you with a Rule 35 in the future,

18   but I did want to make you aware that she is

19   cooperating.

20        THE COURT:  Well, Ms. Ford, that is certainly

21   to your benefit.  And I'm sure that Mr. Couch has

22   explained to you the Rule 35, what that can do for

23   you.  It enables the Court to review your sentence and

24   to take into account this cooperation, but that's up

25   to the government and only the government to file a

1      Rule 35.  So I look forward to receiving that in your

2      behalf, and I will keep into account the notes that

3      I've made with regard to the points that your counsel

4      has made here today.

5            DEFENDANT:  Yes, sir.

6            THE COURT:  And that would all be considered

7      should a Rule 35 be presented to the Court in the

8      future.

9            DEFENDANT:  Yes, sir.

10           THE COURT:  But for our purposes here today, I

11     do determine the presentence report to be accurate as

12     we have modified it here today and it will be

13     incorporated into the sentence.  And it's the judgment

14     of the Court that you be committed to the custody of

15     the Bureau of Prisons and be imprisoned for a term of

16     231 months as to docket No. 3:03CR00135-001 and 225

17     months as to docket No. 3:04CR00011-001, with each

18     term to run concurrently, that is, one with the other.

19         This sentence does meet the mandatory minimum

20     terms of imprisonment required by statute and that it

21     is at the midpoint of the guideline range.  I have

22     found that the sentence meets the goals of punishment

23     and hopefully will deter anyone else from considering

24     similar criminal conduct.

25         I do find no financial ability to pay a fine

20

1    within the guideline range and the fine will be

2    waived.  There is, however, a special monetary

3    assessment of $100 due on each sentence or each case

4    for a total of $200, which is due and payable

5    immediately.  And upon release, you'll be placed on a

6    period of supervised release for a term of five years

7    as to the first docket number that I read earlier, and

8    three years as to the second with, again, each term to

9    run concurrently one with the other, and supervision

10    be under the standard conditions adopted by the Court

11    with the added provision that, as directed by the

12    probation office, that you be required to participate

13    in a program of drug treatment which may include

14    testing.  And the criminal forfeiture matter, that has

15    been resolved for our purposes here today?

16          MR. HENSEL:  Yes, sir.  We're handling that as

17    a part of the plea in cooperation agreement, Judge, so

18    we're not pursuing the criminal forfeiture.

19          THE COURT:  And Mr. Couch, any objections to

20    the ultimate findings of facts and conclusions of law

21    relating to the judgment or sentence?

22          MR. COUCH:  No, sir.

23          THE COURT:  By the government.

24          MR. HENSEL:  No, sir, Judge.

25          THE COURT:  Okay.  And Ms. Ford, you're advised

21

1    you have ten days in which to appeal this sentence.

2    Mr. Couch is appointed to assist you.  If you wish to

3    appeal, notify him of that.  I do always recommend

4    that notice be given in writing and appeal could be

5    taken without cost to you.  And again, I do mention

6    that I would look forward to receiving a Rule 35 on

7    your behalf.  As to Defendant's status?

8            MR. HENSEL:  Judge, she's had a rocky road, if

9    you will.  On pretrial release, she's had two positive

10   urine samples for cocaine, and she's also got a

11   trespass conviction that she got $188.50 court cost,

12   but the probation officer -- or the pretrial services

13   officer, at least, has recommended that she continue

14   on pretrial release, so I'm kind of torn betwixt and

15   between.

16           THE COURT:  Well, again, Ms. Ford, I do note

17   that the probation officer or pretrial officer points

18   out that you've displayed a cooperative and positive

19   attitude.

20           DEFENDANT:  Yes, sir.

21           THE COURT:  And that's what's going to give you

22   the opportunity of remaining out.  Unfortunately, I

23   don't have a calendar right here in this borrowed

24   courtroom.  Today is April 13th.  All right.  Ms.

25   Ford, you'll be allowed to remain at liberty under the

1    same bond with the same terms and conditions applying

2    with the direction that you report to the United

3    States Marshal's Office here in this building by 12:00

4    noon on the 31st of May, or if a place of confinement

5    has been designated by that time, you may report to

6    that facility at your own expense by 12:00 noon on the

7    31st of May.

8            And I do warn that failure to report to either

9    of these two places as directed would constitute a

10   violation of your release conditions and subject you

11   to further prosecution for that violation.  Do you

12   have any questions about that?

13           DEFENDANT:  No, sir.

14           THE COURT:  You need to see the probation

15   officer before you leave here today.

16           MR. COUCH:  Good morning, Your Honor.

17           (WHEREUPON, the sentencing for aforementioned

18   defendant was concluded.)

19

20

21

22

23

24

25

23

1                        CERTIFICATE OF REPORTER

2    STATE OF FLORIDA     )
     COUNTY OF ESCAMBIA )

3

4         I, Donna L. Boland, certify that I was authorized to

5    and did stenographically report the foregoing proceedings

6    and that the transcript is a true and complete record of my

7    stenographic notes.

8

9         WITNESS MY HAND AND SEAL OF OFFICE this the 19th

10   day of April 2004.

11

12   _____
                        DONNA L. BOLAND
13                      Notary Public in and for
                        Walton County, Florida
14                      Commission Expires 7/9/2004

15

16                              Donna L. Boland
                                Commission # CC 953656
17                              Expires July 9, 2004
                                Bonded Thru
                                Atlantic Bonding Co., Inc.

18

19

20

21

22

23

24

25

              WIERZBICKI & STEPHENSON COURT REPORTING SERVICE